## ALLEGHANY CORPORATION v. GUARANTY TRUST CO.
### No. 349.

Circuit Court of Appeals, Second Circuit.
June 9, 1938.

From an order denying a motion by the plaintiff Alleghany Corporation for an injunction pendente lite restraining defendant Guaranty Trust Company of New York from voting plaintiff's shares of common stock of Chesapeake Corporation and from delivering proxies with respect to said shares to any person other than the plaintiff, the latter appeals.

The plaintiff Alleghany Corporation (hereinafter called Alleghany) is the owner of 1,278,000 shares (71%) of the common stock of the Chesapeake Corporation (hereinafter called Chesapeake). Chesapeake is an intermediate holding company which is controlled by Alleghany and itself owns 30.8% of the common stock and 39.5% of the preferred stock Series A of the Chesapeake & Ohio Railway (hereinafter called C. & O.). The common stock of C. & O. has power to elect seven and the preferred stock has power to elect two of C. & O.'s board of nine directors. It is evident from the foregoing stock holdings that Alleghany, through its 71% ownership of the stock of Chesapeake and through the large ownership by Chesapeake of C. & O. stock, not only controls the election of the directors of Chesapeake, but may also control the election of the directors of C. & O. Of the 1,278,000 shares of Chesapeake stock belonging to Alleghany 780,100 shares, along with other securities, are pledged with defendant Guaranty Trust Company under an Indenture of Trust to secure an issue of 15 year collateral trust convertible 5% bonds of Alleghany due February 1, 1944, which now aggregate $31,466,000. The remaining 497,900 shares of Chesapeake stock belonging to Alleghany are pledged with Guaranty under other Indentures of Trust to secure issues of 5% convertible bonds of Alleghany due in 1949 and 1950 aggregating altogether $46,048,000.

Alleghany brought the present suit against Guaranty (1) for specific performance of an alleged obligation of the latter to execute and deliver to Alleghany proxies to vote the 780,100 shares of Chesapeake stock held by Guaranty under the Indenture as security for the Alleghany bonds due in 1944, and (2) for the removal of Guaranty as trustee under that indenture as well as under the other two Alleghany indentures. The bill of complaint also prayed that a preliminary injunction issue restraining Guaranty from voting the shares of Chesapeake stock held by it as security.

Judge Coxe denied the motion for the preliminary injunction and from his order the present appeal has been taken by Alleghany. The annual meeting of Chesapeake has been adjourned to await the decision of the appeal.

Section 2 of Article Three of the 1944 Indenture provides that the president or, in case of his absence or inability to act, one of the vice-presidents of Guaranty, shall make quarterly appraisals of the value of the pledged collateral on May 1 and every three months thereafter and shall deliver a duplicate of each such appraisal to Alleghany as promptly as possible. It also provides that: "In making such appraisal * * * such appraiser shall be entitled in his discretion to rely upon statistical information, reports and financial statements, * * * and upon market quotations and other sources of information, without being required to engage any outside expert or to make any personal examination of any properties, and shall not be responsible for any mistakes or errors of judgment, but in so acting such appraiser shall be required merely to exercise good faith and his best judgment."

Section 3 of Article Three of the 1944 Indenture contains the following provisions: "Unless * * * within thirty days after receipt by the Corporation of any appraisal made and delivered as provided in Sections 2 or 6 of this Article Three showing that the thereinstated aggregate value of the pledged securities and deposited cash * * * is less than 150% of the aggregate amount of the bonds at the time outstanding under this indenture, the Corporation shall not deposit and pledge hereunder with the Trustee, as additional security, stocks, bonds or other corporate securities, to be selected by the Corporation in its discretion, of such aggregate value (determined as provided in Section 2 of this Article Three), or deposit cash to such amount, as shall make the aggregate value of the pledged securities (determined as aforesaid) and deposited cash equal to at least 150% of the ag-

gregate amount of the bonds at the time outstanding hereunder (unless such aggregate value shall have appreciated in the meantime to at least such 150%) * * *."

(a) The Corporation shall be entitled to receive any and all dividends, * * *."

"(b) The Corporation shall have the right to vote upon, or to give any consent in respect of, the pledged shares or any thereof, for all purposes with the same force and effect as though such securities were not subject to this indenture; and from time to time upon the written request of the Corporation, the Trustee forthwith shall execute and deliver * * * to the Corporation * * * appropriate powers of attorney or proxies to vote upon, * * * any of the pledged shares which shall have been transferred to the Trustee or its nominees * * *."

Section 4 of Article Three provides that: "Upon the happening and during the subsistence or continuance" of any of the events of default set forth in Section 3, the "Trustee shall be entitled (1) to collect and receive all dividends on, and to vote or give any consent in respect of, and to avail of or exercise any and all other rights appertaining to, the pledged securities. * * *"

Section 4 of Article Two contains a covenant that if any appraisal shows that the aggregate value of the pledged securities and the deposited cash is less than 150% of the bonds outstanding, then so long as such aggregate shall continue to be less than 150% of the bonds outstanding the Corporation will not declare or pay any dividends; and if the Corporation shall not within thirty days after the delivery of such appraisal deposit additional securities or cash, so as to make the aggregate collateral equal to 150% of the bonds outstanding, the Corporation will not declare or pay any dividends nor incur any indebtedness other than for a term not exceeding one year incurred only for current requirements. Section 4 of Article Two also provides: "The foregoing provisions of this Section 4 are designed to carry out the intent of the Corporation that the aggregate value of the pledged securities and deposited cash * * * shall at all times be at least 150% of the aggregate amount of the bonds then outstanding under this indenture * * *."

A quarterly appraisal was made by Guaranty in accordance with Section 2 of Article Three on November 1, 1937, and delivered to Alleghany on November 2, 1937. It showed that the aggregate value of the pledged securities and deposited cash was less than 150% of the amount of the bonds outstanding and was in fact less than 136% even without any deduction attributable to pending suits which might affect the value of certain Terminal Notes that were part of the pledged collateral and were referred to in a footnote to the appraisal. On November 29, 1937, Alleghany deposited with the Trustee 156,020 shares of the C. & O. stock and $500,000 in cash as additional collateral. On December 2, 1937, thirty days after delivery to Alleghany of the appraisal of November 1, 1937, a new appraisal was made by Guaranty which showed that the ratio of the value of the collateral of the bonds outstanding was less than 143% without any deduction on account of the suits affecting the Terminal Notes. Thereupon the default described in the first clause of Section 3 of Article Three occurred, and Guaranty as Trustee became entitled to vote the pledged stock of Chesapeake. On February 1, 1938, a new quarterly appraisal was made by Guaranty showing a ratio of collateral to Alleghany bonds of less than 129% without any deduction on account of the suits affecting the Terminal Notes referred to.

While it is not disputed that a deficiency in collateral continuously existed between November 1, 1937, and March 2, 1938, it is claimed by Alleghany that on March 2, 3 and 4, 1938, the value of the collateral had so appreciated that its ratio to the Alleghany bonds was as follows:

On March 2,   151.75%
On March 3,   151.68%
On March 4,   148.14%.

The above percentages were arrived at by taking closing sales of the securities comprising the collateral on the New York Stock Exchange.

By letter of March 2, 1938, Alleghany requested Guaranty to pay over to Alleghany income on hand on the ground that the aggregate value of the pledged securities and deposited cash had appreciated to at least 150% of the aggregate amount of the bonds outstanding under the 1944 indenture. By letter of March 12, 1938, Alleghany requested Guaranty to deliver proxies to vote the 780,100 shares of common stock of Chesapeake pledged under such indenture. The purpose was to enable Alleghany to control the forthcoming elec-

tion of the directors of Chesapeake. On March 15, 1938, Guaranty replied that under the appraisal of December 2, 1937, a default in maintaining the collateral at 150% had occurred which still continued and that it had asked its vice-president Callaway to make an appraisal and that when the appraisal was received Guaranty would advise Alleghany whether the requests should be complied with. On March 18, 1938, Alleghany wrote Guaranty insisting that the proxies should be delivered, protesting against the plan Guaranty outlined in its letter of March 15 to have the Terminal Notes valued by experts and demanding that Guaranty "immediately cause this appraisal to be abandoned forthwith" (Record p. 155). The appraisal was, however, made by Callaway as of March 22, 1938, and showed a ratio of only about 109%. In this appraisal the value of the Terminal Notes was written down from $3,101,544.80 to $1,797,822.56 because of the pendency of the suits which were thought to lessen their value by $1,303,722.24. In the prior appraisals no deduction had been made on account of those suits, but even if the deduction had not been made and the Terminal Notes had been carried at the same value as in former appraisals the ratio would have been only about 114%. Alleghany never requested an appraisal as of March 2, 3 or 4. On the contrary it insisted that it was entitled to receive the proxies just as matters stood. On March 22 Guaranty when forwarding the appraisal wrote Alleghany that it would not furnish proxies because an event of default specified in Section 3 of Article Three of the 1944 Indenture had occurred on December 2, 1937, and still subsisted.

The issue is whether the pledgor, Alleghany, or its pledgee Guaranty, has a right to vote the 780,000 shares of Chesapeake stock pledged under the 1944 indenture which now stand in the names of nominees of Guaranty. The determination of this issue so far as the present appeal is concerned is dependent upon the interpretation of that indenture. In the case of the indentures under which the remaining 497,900 shares of Chesapeake stock are pledged there would seem to be no right to demand proxies because defaults have occurred which bar such right.

William J. Donovan, Carl E. Newton, and David Teitelbaum, all of New York City (Theodore S. Hope, Jr., of New York City, of counsel), for plaintiff-appellant.

Davis, Polk, Wardwell, Gardiner & Reed, of New York City (Theodore Kiendl, Frederick A. O. Schwarz, and Porter R. Chandler, all of New York City, of counsel), for defendant-appellee.

Before MANTON, L. HAND, and AUGUSTUS N. HAND, Circuit Judges.

AUGUSTUS N. HAND, Circuit Judge.

It is evident from the foregoing statement of facts, and indeed is not disputed, that the collateral held under the 1944 indenture was, on November 2, 1937, of a value below 150% of the amount of the bonds of Alleghany then outstanding and remained below until March 2, 1938. Closing quotations for sales of Chesapeake stock on the New York Stock Exchange showed a ratio of 151.75% on March 2, and 151.68% on March 3. The ratio, however, remained below 150% even on these two days unless the sales thereon be taken as fairly establishing these ratios of 151.75% and 151.68% respectively in spite of the fact that no deduction was made in valuing the Terminal Notes for the suits by the trustees of the Missouri Pacific Railroad Company and by the Chicago, Burlington & Quincy Railroad involving underlying properties of the maker of the notes. There was admittedly an insufficiency of collateral at all times except on March 2 and March 3, 1938, between November 2, 1937, and April 4, 1938—the date when the last proofs were submitted to the court below on the motion of Alleghany for a preliminary injunction.

An event of default occurred on December 2, 1937, because of the failure of Alleghany within thirty days after the receipt of the appraisal to restore the value of the collateral fixed by the appraisal of November 2, 1937, to 150% of the amount of the bonds outstanding under the 1944 indenture. On December 2, 1937, the ratio was less than 143%.

There are two reasons for holding that the event of default which occurred on December 2, 1937, has not been cured. The first is that the indenture of 1944 provided for fixing the value of the collateral by appraisal and there has been no appraisal showing a restoration of the ratio to 150%. It is true that the instrument does not in terms specify how an event of default may be cured but it seems evident that any restoration of the ratio if properly established will act as a cure and that an appraisal in the mode provided for quarter-

ly appraisals should be applied on other occasions where the value of the collateral is to be determined. Alleghany has offered no excuse for not obtaining an appraisal of the collateral as of March 2 and March 3, and indeed has dispensed with an appraisal by insisting upon its right to require proxies without an appraisal and by saying in its letter to Guaranty of March 18, 1938, which referred to the appraisal then being made, that Guaranty should "cause this appraisal to be abandoned forthwith." The second reason for holding that the event of default has not been cured is that without an appraisal Alleghany can only cure an insufficiency of collateral that has once created an event of default either by showing that no fair appraisal as of March 2 or March 3, 1938, could have fixed the ratio of the collateral for the bonds at less than 150% or by showing that the proper ratio for those dates was at least 150%. The parties here selected an appraiser to fix values whereby the worth of the collateral was to be determined quarterly and under Section 2 of Article Three of the 1944 Indenture the appraiser was not bound to accept market quotations as conclusive proof and could not reasonably be expected to follow them if the general trend of the market or other pertinent evidence indicated lower values. The closing sales of Chesapeake stock always indicated an aggregate value for the collateral of less, often of far less, than 150% both for months before and for weeks after March 2 and 3, 1938. The rise of that stock on March 2 and 3 to a closing price of 48½ on each day was preceded by earlier sales of the stock on March 2 at only 46 and on March 3, at 46⅜. At no time during the year 1938 were any sales made at more than 46½, a figure which would have left the value of the collateral insufficient. Fluctuations in sales of C. & O. stock which comprised the assets of Chesapeake would naturally be reflected in the sales of Chesapeake stock, yet C. & O. rose only ¾ of a point on March 2 and 3 over its price on March 1, while Chesapeake rose on those days about 2½ points. From February 1 to February 21, the spread between the two stocks was from 5¾ to 7¾ but it thereafter widened until on March 2 and 3 it amounted to 11¼ points. On March 2, the Dow-Jones average of rail stocks dropped .31 of a point, and on March 3 dropped .35. It is evident from this that the inexplicable rise of Chesapeake on these two days is no safe criterion on which to base an appraisal and would neither compel nor justify us in giving the stock a value sufficient to cure the existing default. Moreover, there should be some deduction from the value at which the Terminal Notes had been carried in prior appraisals and even if it be thought that the large reduction made by Callaway in the appraisal of March 22, 1938, was excessive, we cannot say that the estimate of this appraiser was not honest when he found with reference to the valuations by Alleghany of the collateral as of March 2 and 3, 1938, that: "A revaluation of the notes of Terminal Shares Inc. taking into account the effect thereon of the above mentioned suits would of itself (and without considering other factors) be sufficient to change the ratios * * * on each of these days from above 150% to below that figure". (Record, pp. 292 and 293). Under the circumstances we think it is unreasonable to find that the ratio of 150% was restored. Where Alleghany has made no better showing than here, we hold that there is no proof that the default has been cured or that a preliminary injunction should be granted.

The event of default which occurred on December 2, 1938, at all times subsisted so that Guaranty as Trustee under the 1944 indenture was entitled by Section 4 of Article Three thereof to vote the Chesapeake stock.

Order affirmed.